# COURT OF APPEALS,

## July 13, 1915.

## THE PEOPLE v. LEWIS M. ROACH.

(215 N. Y. 592.)

(1.) MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon a trial for murder in the first degree examined, and *held*, to present a question of fact for the jury and to be sufficient, if true, to justify a judgment of conviction.

(2.) SAME—WHEN NO ADVERSE INFLUENCE CAN BE DRAWN FROM FAILURE TO CALL WITNESS AS TO LOW MENTALITY.

Where, upon a trial for murder, there is evidence from which the jury might infer that a possible witness for the People is a man of low mentality who cannot testify intelligently no inference adverse to the prosecution can be drawn from its failure to call him as a witness, more especially where the defective is in court and may be called by the defense should his testimony be desired.

(3.) SAME—CONFESSIONS—VERDICT OF JURY AS TO WHETHER VOLUNTARY, CONCLUSIVE.

Where, whether or not confessions of the defendant were voluntary was the subject of conflicting testimony, and the court received all the evidence that was offered bearing upon the question and submitted the matter to the jury with proper instructions, their verdict as to their voluntary character is conclusive.

(4.) SAME—PROOF OF CORPUS DELICTI ONLY ADDITIONAL PROOF NECESSARY TO WARRANT CONVICTION.

The only additional proof which the statute makes necessary to justify a jury in convicting a defendant who has confessed his guilt is that there shall be proof " that the crime charged has been committed." (Code Crim. Pro. § 395.) There must be evidence in addition to the confession to prove the *corpus delicti*, but when, as in this case, the *corpus delicti* is proved by independent evidence, and the defendant has voluntarily confessed his guilt, a case for the jury is made out, and a conviction based upon such testimony is warranted in law.

(5.) SAME—EXPERT EVIDENCE AS TO FINGER PRINTS COMPETENT AND WEIGHT THEREOF FOR JURY.

The evidence of an expert as to the identity of the finger prints of the defendant with blood marks found upon the clapboards of the house where the murder was committed, was a proper subject for the consideration of the jury, and the weight to be given to this evidence was for it, not the court, to determine.

(6.) SAME—WHEN TESTIMONY OF ATTORNEY AS TO CONVERSATION HAD IN PRESENCE OF SEVERAL OTHER PERSONS IMPROPERLY REJECTED.

Testimony of an attorney was offered to contradict a denial by a witness for the prosecution that he had made certain statements to said attorney and objection thereto was sustained upon the ground that the proposed witness was acting as attorney for the county and could not disclose the information that he had received. Several other persons were present when this alleged conversation occurred. *Held*, error, but, that while the testimony might well have been admitted for the purpose of showing bias or hostility on the part of the witness, where it is not reasonable to suppose that its admission could have contributed to change the result, its exclusion was one of those errors which this court in a case of this character is expressly required to disregard. (Code Crim. Pro. § 542.)

(7.) SAME—WHEN ERROR WILL BE DISREGARDED—TESTIMONY OF PRIVATE DETECTIVE—WHEN PROPERLY REJECTED THOUGH GROUND STATED FOR ITS SECLUSION ERRONEOUS.

Defendant sought to prove by a private detective that neither the defendant nor his employer had acted in a manner to indicate consciousness of guilt on their part. Objection was made to this testimony on the ground that it was prohibited under section 74-b of the General Business Law as amended by chapter 515 of the Laws of 1910. The court sustained this objection. That section prohibits a licensed detective from revealing without his employer's consent information obtained by him " except as he may be required by law." *Held*, that it was clearly without application to this case, and the reason assigned by the court for the exclusion of this testimony was erroneous. The ruling itself, however, was correct. The evidence sought to be presented was incompetent; it was purely negative in character, and designed merely to show that the witness had been unable to discover evidence of the defendant's guilt. As the evidence thus sought to be introduced was incompetent, no error can be predicated upon its exclusion.

(8.) SAME—GOOD CHARACTER—CHARGE.

Defendant's counsel asked the court to charge that the defendant's

good character " which is not questioned is presumptive evidence of his, innocence." In response to this request the court said: " I will charge the jury that the evidence of his good character in itself might be sufficient to create a reasonable doubt." To this charge the defendant excepted and again repeated his last request to charge and the court replied: " He is presumptively innocent in all respects until the proof shows otherwise." *Held,* that the refusal of the court to charge as requested was not error when considered in connection with the charge made. (People v. Conrow, 200 N. Y. 356, 260, distinguished.)

APPEAL from a judgment of the Supreme Court, rendered December 14, 1914, at a Trial Term for the county of Montgomery, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Andrew J. Nellis* and *J. S. Sitterly* for appellant.

It was not proved beyond reasonable doubt that appellant was not compelled to be a witness against himself. (Matter of Randel, 158 N. Y. 216; Wylde v. N. R. R. Co., 53 N. Y. 156.) Very material error was committed in excluding testimony as to admissions and declarations made by Van Wie concerning his desire to get something on appellant's employer and also to the effect that appellant was very easily controlled by any person. (Bank of Utica v. Mersereau, 3 Barb. Ch. 598; People v. Buchanan, 145 N. Y. 1.)

*George M. Albot, District Attorney,* for respondent.

The confessions made by the defendant at the inquest before Coroner Simons were admissible against him upon the trial. (Hendrickson v. People, 10 N. Y. 1; Teachout v. People, 41 N. Y. 7; People v. McGloin, 91 N. Y. 241; People v. Chapleau,. 121 N. Y. 266; People v. Wright, 136 N. Y. 625; People v.

Molineux, 168 N. Y. 264.) All the defendant's confessions were clearly admissible against him. (People v. Scott, 195 N. Y. 224; People v. Buffon, 214 N. Y. 57; People v. Jaehne, 103 N. Y. 182; People v. Deacons, 109 N. Y. 374.) The charge of the court on the question of the inferences the jury might draw because certain witnesses the defendant's counsel named were not called by the People, was quite as favorable to the defendant as he was entitled to have. (Brooks v. Steen, 6 Hun, 516; Goldstein v. Brooklyn Heights R. R. Co., 69 App. Div. 617; Matter of Randel, 158 N. Y. 216; Wylde v. Northern R. R. Co., 53 N. Y. 156.) There was no error committed by the trial court in his charge to the jury upon the question of good character of the appellant. (People v. Dippold, 30 App. Div. 62; People v. Sweeney, 133 N. Y. 610.)

SEABURY, J.:

John Barrett was a farmer 69 years of age and lived upon his farm in the town of Palatine in the county of Montgomery. With him resided his daughter Katie and his son Boyd. Katie was 23 years of age and Boyd 29 years of age. The latter was mentally deficient. About 1,000 feet from the Barrett farm was the farm where the defendant was employed as a laborer. On the evening of December 20th, 1913, Barrett and his son Boyd retired to bed at about 9:20 P. M. Katie remained in the sitting room, seated by the stove. She was awakened from her sleep and recalls seeing a shadow or vision and was struck down with a heavy piece of wood. When she regained consciousness she was standing in the storehouse south of the dining room door. She heard her brother Boyd come down from his bedroom and spoke to him and he came to where she was standing. She sent her brother to a neighbor for help and when he returned with the neighbor they entered the house. Kerosene had been poured on the wood in the woodbox and there was a fire burning in the box. A pail of water was thrown upon the

fire and extinguished it. Katie was covered with blood from the
wounds which had been inflicted upon her. In the sitting room
was the dead body of Barrett. It is not necessary to describe
the scene. It is sufficient to say that the dead body of Barrett
was upon the floor with indisputable evidence of his having been
shot and beaten to death. In the storehouse where Katie was
taken after the assault upon her was a window weight similar
to other window weights used on the farm where the defendant
worked, also a rolling pin with blood stains upon it which had
customarily been kept behind the kitchen door of the Barrett
house. Upon the clapboards of the house to one side of the
kitchen door, about forty inches from the ground, were five
marks. It is claimed that these were marks of human blood and
were the finger-print impressions of the defendant. Reference
will again be made to these marks. The circumstances surround-
ing the killing bear ample testimony to the deliberate and pre-
meditated nature of the murder. There was money in the house
at the time of the murder but none of it was stolen, and there
is nothing to indicate that theft was a motive which induced the
act of the murderer. It appears by testimony independent of
the confessions made by the defendant which will be discussed
below, that before the murder the defendant's employer and
Barrett had quarreled, that they were not upon good terms,
and that angry words had passed between them as to the right
to use a spring near the boundary of the two farms. The de-
fendant's employer had spread poisoned corn upon his land
near the land of the deceased to kill the chickens of the deceased,
saying that it was placed there to kill crows. The defendant
knew of this ill feeling existing between his employer and the
deceased. The defendant and his employer had discussed the
purchase of Barrett's farm with a view of giving the defendant
a home upon it, and Barrett had been asked to put a price upon
his farm and had fixed a price which the defendant and his em-
ployer thought was too high. So much of this case seems not

to be open to dispute. Upon seven different occasions and to four different persons the defendant confessed that he committed the murder and it is claimed that in his confessions he implicated his employer. It is not necessary to state in detail the contents of these varous confessions or to refer to the circumstances under which they were made. It is sufficient for our present purpose to point out that these confessions unequivocally admit the defendant's guilt and show that the motive actuating him was the removal of Barrett in the hope that his farm could then be purchased and that he might secure a home upon it with the assistance of his employer. With this brief outline of the nature of the case we are in a position to consider the objections urged by the appellant to the judgment of conviction.

The claim that the defendant established an alibi rests upon the defendant's own testimony, which the jury did not regard as worthy of belief. The time of the murder is not fixed with precision. It is evident, however, that it happened between 9:30 and 11 o'clock. The defendant testified that he arrived at his dwelling house from Canajoharie at about 10 o'clock. In this he is corroborated by the testimony of a fellow-workman named Ure. There was, however, ample time after this for the defendant to have committed the murder. Barrett's farm house was but a short distance away from the place where the defendant concededly was at 10 o'clock and it was possible for the defendant arriving at his house at 10 to have armed himself with the revolver which it is said he had hidden in the barn and to have committed the murder and returned to his house by 11 o'clock. It is true that he testified that after he returned at 10 he went to bed and remained there during the night. He was corroborated in this by the testimony of his wife. Their testimony, however, merely presented an issue of fact which the jury decided against the defendant.

In connection with the objection last discussed, which relates

to the time when the murder was committed, it is convenient to consider the request to charge which the defendant made in relation to Boyd Barrett. At the close of the charge defendant's counsel said: " Since the exact time when John Barrett was killed is a material and relevant fact upon the question of defendant's guilt or innocence, the People's failure to call Boyd Barrett to testify and to submit him to cross-examination requires the inference that, had he testified, his testimony, in connection with the other testimony in the case, would establish beyond a reasonable doubt that John Barrett was killed before ten P. M of the day on which he was murdered." In answer to this request the court stated there was testimony from which the jury might infer that Boyd Barrett was a man of low mentality who could not testify intelligently, and that if " he was a man of such a low mentality that he could not reason, so low that he could not understand the nature of an oath, and that his testimony would not be reliable under any circumstances," then the People were not required to bring him before the jury. The request to charge made by the defendant's counsel was much too broad to justify the court in charging it; but in addition to this defect of form, the court was justified in refusing to charge as requested in view of the evidence in the record that Boyd Barrett was deficient in understanding and not able to talk intelligently. Under these circumstances no inference adverse to the People could be drawn from the failure of the district attorney to call him as a witness. The defendant himself testified that Boyd Barrett was " a boy that can hardly talk," and there is no evidence in the record suggesting the contrary. Moreover, if there was any doubt about Boyd's ability to testify, or if the defendant wished his testimony, he could have been called by the defense. Boyd Barrett was present in the court room during the trial, and upon one occasion was called upon to stand while he was identified by a witness. Either side could have called him as a wit-

ness.  The failure of the district attorney to call him, under the circumstances disclosed, justified the court in its refusal to charge as requested.

Whether or not the confessions of the defendant were voluntary was the subject of conflicting testimony.  The court received all the evidence that was offered bearing upon this question and submitted the matter to the jury with proper instructions which left it to the jury to say whether or not the confessions were voluntary.  We cannot say upon the evidence presented that the jury were not justified in concluding that the confessions were voluntary.  The defendant is said first to have been subjected to threats in December, 1913, the month during which the crime was committed, but it is not claimed that the defendant made any confession during this month.  He is said to have again been threatened on the night of June 23d, 1914, but it is not claimed that he made any confession at this time.  The first confession is said to have been made on June 25th, 1914.  In view of the fact that the alleged threats against the defendant were made so long a time before the confessions were made, we would not be justified in asserting as a matter of law that the confessions were involuntary.  While in a room waiting to be taken before the coroner the defendant got upon his knees and uttered the following prayer:  " Oh God, my Heavenly Father, I pray of Thee that Thou will forgive me for my sins in this crime that I have committed; that Thou wilt take care of my darling wife and my little boy and make him a better man than his father."  Van Wie was present and told the defendant that the prayer involved a confession and the defendant said he knew that and was willing to confess.  He was taken before the coroner and made and signed two sworn statements admitting his guilt and describing in detail the circumstances under which he committed the murder.  He repeated his confession to the wife of the coroner and to a newspaper editor who called upon him

while he was confined in jail. He also made confessions to other persons. The only confessions to which there can be said to be any color of justification for the claim that they were as a matter of law involuntary, were the two sworn confessions made to the coroner. It is significant also that although the defendant testified upon the trial as to these confessions he did not deny that he made them or that the testimony of the witnesses as to what he had said in these confessions was true. The confessions were admissible in evidence against the defendant and were submitted to the jury under proper instructions and under these circumstances the verdict of the jury is conclusive upon their voluntary character. (People v. Ferola, 215 N. Y. 285; People v. Garfalo, 207 N. Y. 141, 29 N. Y. Crim. 527; People v. Rogers, 192 N. Y. 331, 22 N. Y. Crim. 376; People v. Chapleau, 121 N. Y. 266; People v. McGloin, 91 N. Y. 241, 1 N. Y. Crim. 154; Teachout v. People, 41 N. Y. 7; Hendrickson v. People, 10 N. Y. 13.) It is further claimed that these confessions were not sufficiently corroborated to justify the verdict of the jury. It is provided in section 395 of the Code of Criminal Procedure that the confession of the accused " is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed." It will be observed that the statute does not require that the confession itself shall be corroborated. It provides merely that alone it shall be insufficient to warrant conviction. The only additional proof which the statute makes necessary to justify a jury in convicting a defendant who has confessed his guilt is that there shall be proof " that the crime charged has been committed." There must be evidence in addition to the confession to prove the *corpus delicti*, but when, as in this case, the *corpus delicti* is proved by independent evidence, and the defendant has voluntarily confessed his guilt, a case for the jury is made out, and a conviction based upon such testimony is warranted in law. At common law the nature

and degree of evidence in addition to a confession that was required is said to have been governed by " judicial practice " rather than by the " law of evidence," and the courts seem not always to have been in agreement as to the rule applied. (Wigmore on Ev. § 2070.) In this state the statute referred to above has put at rest any uncertainty that may have existed upon this subject and codifies the rule that there must be proof in addition to the confession as to the *corpus delicti.* (People v. Badgley, 16 Wend. 53; People v. Jaehne, 103 N. Y. 182, 199, 4 N. Y. Crim. 478; People v. Deacons, 109 N. Y. 374, 378; People v. Brasch, 193 N. Y. 46, 60, 23 N. Y. Crim. 69; People v. Burness, 178 N. Y. 429, 431; People v. Giusto, 206 N. Y. 67, 27 N. Y. Crim. 313.) In the present case the fact of the killing of John Barrett and that he was murdered with deliberation and premeditation was abundantly proved without regard to any of the confessions of the defendant. Indeed, it was a conceded fact in the case that was affirmed upon both sides. Under these circumstances there cannot be doubt that if the People proved that the confessions were voluntary there was ample evidence to justify the jury in convicting the defendant, without regard to the corroboration which is said to have been derived from the comparison of the finger-print impressions of the defendant with the marks that were found upon the clapboards of the house near the kitchen. It is earnestly insisted that the admission in evidence of the testimony of an alleged expert as to finger-print impressions was error and of such a material character as to have wrought grave injury to the defendant and to necessitate the reversal of this judgment. This testimony was given in relation to five separate marks which were discovered upon the clapboards of the house near the kitchen door. The portion of the boards bearing these marks was cut out and was submitted to experts in finger printing and was offered in evidence upon the trial. The marks were so placed upon the board and were of such

a shape or design that they could have been made by soiled fingers. It was proved that the impressions represented by these marks were made in human blood. The evidence upon this subject was summarized by the trial judge in his charge to the jury as follows:

"Hamilton says that the marks were the marks of fresh blood upon the finger ends of a human hand. Finger impressions of the left hand of this defendant were taken upon various occasions. In these experiments the left hand of the defendant was held at the wrist alone, and the hand permitted to assume a natural position, with the fingers extended when the fingers touched the paper below. These impressions made upon several sheets of paper were such that the finger prints of the four fingers fitted over the four finger prints upon the clapboards. Whether this be a coincidence of great value will be determined by the jury. Also, it was sworn by Hamilton that the lineations upon the thumb exactly corresponded with the lineations upon the lower mark upon the clapboard. Hamilton swears that these marks were the finger prints of the left hand of the defendant." At the close of the charge the counsel for the defendant asked the court to charge: "That they need not adopt the opinion of the witness Hamilton that the stains upon People's Exhibits 11 and 12 are of human blood. They may give it such weight as they deem fitting." The court charged as requested. Counsel then said: "I ask your honor also to charge, in considering the question, that is, as to whether the stains are human blood, they should give due weight to Mr. Hamilton's testimony, in effect, that that fact could be ascertained only by a highly trained expert upon both chemical and microscopic analysis, each of which must be conducted with extreme care, and that the constituents so analyzed and studied must be changed into crystalline forms only visible through high powered miscroscopes, and that the crystals made from human blood and those made from the blood of some other

animals so closely resemble each other that extreme nicety of observation by a competent expert is requisite to detect the slight differences and conclude that the substance under observation is the product of human blood and not the product of the blood of some other animal. That was in substance his testimony as to that." The court again charged as requested.

The record shows that the following requests and rulings were made:

Defendant's counsel, Mr. Nellis: "Before the jury can be satisfied that the stains were made by the left hand of defendant on the night of the murder, each one of the following propositions must be established to their satisfaction beyond a reasonable doubt:

" 1. The stains did not exist prior to that day.

" 2. They were made by human blood.

" 3. The blood was of the murdered man or his daughter or of their mingled blood.

" 4. Stain marked W—that is the one for the little finger —was made by the defendant's little finger.

" 5. Stain marked X was made by defendant's ring finger.

" 6. Stain marked Y was made by defendant's middle finger.

" 7.. Stain marked Z was made by defendant's forefinger.

" 8. That these stains were made simultaneously.

" 9. That they were not made at the same time stain marked K was made. You know the expert said—

" The Court: At the same identical moment?

" Mr. Nellis: Yes, sir.

" The Court: Is that all?

" Mr. Nellis: That is all of the particular request to charge.

" The Court: I so charge.

" Mr. Nellis: They must be satisfied of each one of those things beyond a reasonable doubt.

" The Court: Yes.

" Mr. Nellis: Now, excluding the confessions, there is no sufficient proof to establish beyond a reasonable doubt that stain marked K is a thumb print and not a finger print. Mr. Hamilton so said. He didn't know by looking at the stain whether it was a thumb print or a finger print.

" The Court: I will charge there is no testimony upon that subject.

" Mr. Nellis: All right, just as well, I will accept that.

" Excluding the confessions, there is no sufficient proof that stains marked W, X, Y, Z and K were not made simultaneously; that is, by the hand reaching out and put on that wall; that there is no sufficient proof that the whole hand was not put against the board at the same time.

" The Court: I will charge there is no testimony upon that subject. However, inference is proof. The jury may indulge in inference."

Before testifying to his opinion as to the identity of the defendant's finger prints with the marks upon the board the witness explained fully his qualifications, specified the circumstances upon which he predicated his opinion and swore that he was able to express an opinion with reasonable certainty. He was exhaustively and skillfully cross-examined as to every detail of his testimony. Ample basis was afforded for the jury to come to an intelligent conclusion as to the correctness of the opinion which he expressed. In view of the progress that has been made by scientific students and those charged with the detection of crime in the police departments of the larger cities of the world, in effecting identification by means of finger-print impressions, we cannot rule as a matter of law that such evidence is incompetent. Nor does the fact that it presents to the court novel questions preclude its admission upon common-law principles. The same thing was true of typewriting, photography and X-ray photographs, and yet the reception of such evidence is a common occurrence in our courts. The evidence

to prove identity often presents doubtful and unsatisfactory features.   One man may be mistaken for another because they look alike, or identity of person may be inferred from similarity of features, height, expression or a variety of other circumstances.   Under common-law principles whatever tends to prove any material fact is relevant and competent.   The evidence as to footprints is admissible.   (Young v. State, 68 Ala. 569, 574; Jones v. State, 63 Ga. 395, 398, 401; People v. Storrs, 207 N. Y. 147, 153.)   In Castleton's Case (3 Crim. App. Rep. 74) the Court of Criminal Appeal in England upheld a conviction where the only proof of identification was evidence as to finger prints upon a candle.   In People v. Jennings (252 Ill. 534) evidence was received of the imprint of four fingers of someone's left hand in fresh paint upon a railing, and also the opinion of experts that such finger prints and the finger prints of the defendant were impressions of the same hand.   The opinion of Chief Justice CARTER in that case contains an instructive and learned discussion of this whole subject.   The fact that error may sometimes result in effecting identification, by this means affords no reason for the exclusion of such evidence.   Mistakes may also occur in effecting identification by personal appearance, casual meeting, by handwriting or by one's voice heard in the dark or over the telephone, but evidence of this character is admissible and its weight is to be determined by the jury.   Courts have often allowed proof of circumstances apparently very trivial as evidence upon which identification might be effected.   (State v. Rainsbarger, 74 Ia. 196; Wilbur v. Hubbard, 35 Barb. 303.)   The evidence of the expert as to the identity of the finger prints of the defendant, with the blood marks found upon the clapboards of the house, was a proper subject for the consideration of the jury.   The weight to be given to this evidence was for the jury, not the court, to determine.   Certainly the reception of this evidence would not justify the reversal of this judgment.   It is urged

that the trial court erred in excluding the evidence of one Woollard. When the murder was being investigated by the authorities Woollard was employed by the county of Montgomery as an attorney, and in that capacity he took certain affidavits from some of the witnesses. Van Wie was a special deputy sheriff and had been instrumental in gathering evidence against the defendant. He was a witness in behalf of the People upon the trial. Upon cross-examination he was asked as to certain statements that he was alleged to have made to Woollard to the effect that he wished to get evidence against the defendant's employer and that the defendant was a man who was easily controlled. He denied making these statements. To contradict him the defense offered the testimony of Woollard. Objection to this testimony was urged upon the ground that Wollard was acting as attorney for the county and could not disclose the information that he had received in that capacity. The court sustained this objection. Several other persons were present when this alleged conversation occurred. The ground upon which this ruling was based was erroneous. (People v. Buchanan, 145 N. Y. 1.) While this evidence might well have been admitted for the purpose of showing bias or hostility on the part of the witness (People v. Brooks, 131 N. Y. 321), its exclusion can hardly be said to constitute prejudicial error. In so far as it was offered to show that the witness had said that the defendant was a man easily controlled it did not tend to establish bias or hostility to the defendant and was relevant only upon the issue as to whether the confessions were voluntary. In so far as it was designed to show hostility against the defendant's employer, it was, under the peculiar facts of this case, admissible. It was, however, in any event, somewhat remote and the whole cross-examination of Van Wie and the other facts proven in reference to his testimony left no doubt as to his interest in securing a

conviction. Under these circumstances, which were considered by the jury, it is not reasonable to suppose that the admission of this testimony could have contributed to change the result. Its exclusion, therefore, was one of those errors which this court in a case of this character is expressly required to disregard. (Code Crim. Pro. sec. 542.)

It is urged that the exclusion of the testimony of the witness Zimmer was error. Zimmer was a private detective who had resided after the murder at the house of the defendant's employer, and had the defendant and his employer under observation for a considerable period of time. The defendant sought to prove by him that neither the defendant nor his employer had acted in a manner to indicate consciousness of guilt on their part. Objection was made to this testimony on the ground that it was prohibited under section 74-b of the General Business Law as amended by chapter 515 of the Laws of 1910. The court sustained this objection. That section prohibits a licensed detective from revealing without his employer's consent information obtained by him " except as shall be required by law." It clearly was without application to this case, and the reason assigned by the court for the exclusion of this testimony was erroneous. While the ground assigned for this ruling was erroneous, the ruling itself was correct. The evidence sought to be presented was incompetent; it was purely negative in character, and designed merely to show that the witness had been unable to discover evidence of the defendant's guilt. In offering this testimony the defendant's counsel said: " I want to have him divulge nothing that he has learned but what he has failed to learn in spite of all his trying." As the evidence thus sought to be introduced was incompetent, no error can be predicated upon its exclusion. Defendant's counsel asked the court to charge that the defendant's good character

"which is not questioned is presumptive evidence of his innocence." In response to this request the court said: "I will charge the jury that the evidence of his good character in, itself might be sufficient to create a reasonable doubt." To this charge the defendant excepted and again repeated his last request to charge and the court replied: "He is presumptively innocent in all respects until the proof shows otherwise." The refusal of the court to charge as requested was not error when considered in connection with the charge made. The defendant is presumed innocent even where evidence of good character is not offered. Evidence of good character when considered in connection with all the other evidence in the case may create in the minds of the jurors a reasonable doubt, when without such evidence none would exist. The court had already charged the jury as to the presumption of innocence and repeated this charge when this request was made and charged the jury that evidence of good character might of itself be sufficient to create a reasonable doubt. In People v. Conrow (200 N. Y. 356, 360), upon which the appellant relies, the charge under review was different from the charge made in this case. In that case the court did not charge the jury that evidence of previous good character may of itself create a reasonable doubt, but erroneously limited the consideration of the evidence of good character to a case where the questions of fact affecting the quiet or innocence of the accused were closely or nearly evenly balanced. The jury in the present case were correctly instructed on this subject and no just ground of criticism exists.

We have examined the other points urged upon our attention in the brief of the appellant, but find nothing in them that would justify a reversal of the judgment or that requires discussion. The evidence presented a question of fact for the jury and is sufficient, if true, to justify the judgment of con-

viction. The trial was free from any substantial error. Under these circumstances no reason exists which would justify this court in interfering with the judgment.

The judgment of conviction should be affirmed.

HISCOCK, CHASE, CUDDEBACK and MILLER, JJ., concur; WILLARD BARTLETT, Ch. J., not voting; HOGAN, J., dissents.

Judgment of conviction affirmed.